02-11-122-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-11-00122-CV

 

 


 
 
 In the Interest of S.G.
 and S.J.G.
 
 
  
 
 
  
 
 
 
 
  
  
  
 
 
 
 
  
 
 
  
 
 
  
 
 


----------

 

FROM THE 158th
District Court OF Denton COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          Appellant
A.G. (Father) appeals the termination of his parental rights to his children S.G.
and S.J.G.  We will affirm.

Background
Facts

          Father
is the biological father of S.G., who was six years old at the time of trial,
and S.J.G., who was almost three years old.  The mother of the children is Father’s
former girlfriend (Mother), who had two older children from an earlier
relationship.  The Department of Family and Protective Services (the
Department) was notified in April 2010, of alleged abuse of the four children
by Mother.[2]  At the time, Father was
incarcerated for assaulting Mother.

Child
Protective Services (CPS) investigator Lishawa Jackson interviewed the
children.  S.G. told her that they were being spanked with hangers and that the
children had to sleep in the garage because Mother was running a massage
business out of the house.  M.G., the children’s nine year old half-brother,
told Jackson that when it was hot, they would plug in a fan, and when it was
cold they would plug in a heater.  When the garage got too hot, the children
would put ice bags on the bed to cool it off.  When Mother had a client, the
children had to wait outside for eight minutes before they were allowed to come
in.  Other women worked with Mother out of the house, and the bedrooms were
numbered “One,” “Two,” and “Three.”  S.G. told Jackson that sometimes he would
stay home alone with S.J.G., his then two year old sister.  Jackson also
interviewed Mother at the home.  Mother denied that the children slept in the
garage, or had to use a fan or ice packs on beds in the garage, although she
did acknowledge that the children would plug in an electric heater in the
winter.  M.G. also confirmed that Mother spanked them with a hanger, which
Mother did not deny.

          The
CPS investigation also revealed ads Mother had posted on websites advertising
her services with pictures of her in lingerie.  While Jackson was at the home interviewing
Mother, the police arrived to arrest Mother on outstanding warrants.  When the
police told Mother that they suspected she was engaging in prostitution out of
her home, Mother replied that she “had to do what she had to do.”  Jackson
visited Father in jail and asked him if he had concerns about Mother’s
prostitution.  He said he did, “but what [could he] do about it, [he was] in
jail.”

          In
April 2010, the Department took the children into its care and filed for
termination.  They were put in a foster home because there was no suitable
family placement.  The court ordered the parents to complete CPS-designed service
plans.

          After
a bench trial on March 14 and 15, 2011, the trial court found by clear and
convincing evidence that Father engaged in conduct or knowingly placed the
children with persons who engaged in conduct which endangered the physical or
emotional well-being of the children, failed to comply with the provisions of a
court order that specifically established the actions necessary for the parent
to obtain the return of the children, and that termination was in the best
interest of the children.[3]  Father now appeals.

Standard
of Review

A
parent’s rights to “the companionship, care, custody, and management” of his or
her children are constitutional interests “far more precious than any property
right.”  Santosky v. Kramer, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397
(1982); In re M.S., 115 S.W.3d 534, 547 (Tex. 2003).  “While parental
rights are of constitutional magnitude, they are not absolute.  Just as it is
imperative for courts to recognize the constitutional underpinnings of the
parent-child relationship, it is also essential that emotional and physical
interests of the child not be sacrificed merely to preserve that right.”  In
re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, the State
seeks not just to limit parental rights but to erase them permanently—to divest
the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child’s right to inherit.  Tex.
Fam. Code Ann. § 161.206(b) (West 2008); Holick v. Smith, 685
S.W.2d 18, 20 (Tex. 1985).  We strictly scrutinize termination proceedings and
strictly construe involuntary termination statutes in favor of the parent.  Holick,
685 S.W.2d at 20–21; In re R.R., 294 S.W.3d 213, 233 (Tex. App.—Fort
Worth 2009, no pet.).

          In
proceedings to terminate the parent-child relationship brought under section
161.001 of the family code, the petitioner must establish one ground listed
under subsection (1) of the statute and must also prove that termination is in
the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (West Supp.
2011); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be
established; termination may not be based solely on the best interest of the
child as determined by the trier of fact.  Tex. Dep’t of Human Servs. v.
Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

          Termination
decisions must be supported by clear and convincing evidence.  Tex. Fam. Code
Ann. §§ 161.001 (West Supp. 2011), 161.206(a) (West 2008).  Evidence is
clear and convincing if it “will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.”  Id. § 101.007 (West 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In re J.F.C., 96 S.W.3d 256, 263
(Tex. 2002); see In re J.A.J., 243 S.W.3d 611, 616 (Tex. 2007)
(contrasting standards for termination and modification).

Discussion

I.  Legal
and Factual Sufficiency of the Evidence

          A.
 Grounds for Termination

          In
evaluating the evidence for legal sufficiency in parental termination cases, we
determine whether the evidence is such that a factfinder could reasonably form
a firm belief or conviction that the grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005).  We review all the evidence in
the light most favorable to the finding and judgment.  Id.  We resolve
any disputed facts in favor of the finding if a reasonable factfinder could
have done so.  Id.  We disregard all evidence that a reasonable
factfinder could have disbelieved.  Id.  We consider undisputed evidence
even if it is contrary to the finding.  Id.  That is, we consider
evidence favorable to termination if a reasonable factfinder could, and we
disregard contrary evidence unless a reasonable factfinder could not.  Id.

          We
cannot weigh witness credibility issues that depend on the appearance and
demeanor of the witnesses, for that is the factfinder’s province.  Id. at
573, 574.  And even when credibility issues appear in the appellate record, we
defer to the factfinder’s determinations as long as they are not
unreasonable.  Id. at 573.

In
reviewing the evidence for factual sufficiency, we give due deference to the
factfinder’s findings and do not supplant the judgment with our
own.  In re H.R.M., 209 S.W.3d 105, 108 (Tex. 2006).  We determine
whether, on the entire record, a factfinder could reasonably form a firm
conviction or belief that the parent violated subsections (E) or (O) of
section 161.001(1) and that the termination of the parent-child relationship
would be in the best interest of the child.  Tex. Fam. Code Ann.
§ 161.001; C.H., 89 S.W.3d at 28.  If, in light of the entire
record, the disputed evidence that a reasonable factfinder could not have
credited in favor of the finding is so significant that a factfinder could not
reasonably have formed a firm belief or conviction in the truth of its finding,
then the evidence is factually insufficient.  H.R.M., 209 S.W.3d at 108.

          In
his first two points, Father argues that the evidence is legally and factually
insufficient to support termination under subsections (E) and (O).  See
Tex. Fam. Code Ann. § 161.001(1)(E), (O).  Subsection (O) provides for
termination when a parent fails to comply with the provisions of a court order
that specifically establishes the actions necessary for the parent to obtain
the return of the child who has been in the permanent or temporary managing
conservatorship of the Department for not less than nine months as a result of
the child’s removal from the parent under Chapter 262 for the abuse or neglect
of the child.  See Id. § 161.001(1)(O).  Father was court ordered
to, among other things,

          (1)   establish and maintain safe,
stable, and appropriate housing for a period of at least six months;

 

          (2) establish and maintain suitable
employment for a period of at least six months;

 

          (3) register with the Texas
Workforce Commission within three work days of becoming unemployed; 

 

          (4)   submit to a drug and alcohol
assessment with Brief Therapy Institute and follow all recommendations from
that assessment;

 

          (5)   attend weekly counseling
sessions through Brief Therapy Institute and cooperate fully in all
recommendations made through the counseling sessions;

 

(6)   complete
parenting classes with the Child and Family Guidance Center;

 

(7)   submit to drug
testing;

 

(8) submit to a
psychological evaluation and follow all recommendations from the evaluation;
and

 

(9) have supervised
visitation with the children once a week.

 

Father
admitted at trial that he had been unemployed since he was released from jail. 
He testified that he was hired for a position but was terminated the same day
because he had a visitation with his children scheduled for that day.  He
provided no documentation or witness to corroborate that testimony.  He said he
was waiting until after trial to get a job.  He also admitted that he did not
register with the Texas Workforce Commission.  Despite being unemployed, the
testimony established that Father missed multiple visits with his children,
which Father acknowledged.

Father
also admitted that he never went to the required counseling sessions.  He
testified that he tried, but the counselor was ill and the substitute counselor
was booked.  Father never notified the Department of his problem or asked for
their assistance, even though he had his caseworker’s cell phone number at all
times.  He testified that he could not go to another counselor because they
were too far and he did not have a driver’s license.  He blamed the “State of
Texas” for his lack of license because the State would not waive tickets he had
not paid.  Father claimed he was going to a private counselor, but he later
explained that the doctor was just a psychiatrist who was monitoring Father’s
medication.  He also testified that he had requested an MHMR counselor while in
jail but never saw one.

It
is well settled that the family code does not provide for excuses for failure
to complete court ordered services, nor does it consider “substantial
compliance” to be the same as completion.  See In re M.C.G., 329 S.W.3d
674, 675–76 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); In re T.T.,
228 S.W.3d 312, 319 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (noting
Texas courts have uniformly found substantial compliance with provisions of court
order inadequate to avoid termination finding under subsection (O)); In re
T.N.F., 205 S.W.3d 625, 630–31 (Tex. App.—Waco 2006, pet. denied) (emphasizing
that parents must comply with every requirement of the court order and that
subsection (O) does not allow for consideration of excuses for noncompliance); Wilson
v. State, 116 S.W.3d 923, 929 (Tex. App.—Dallas 2003, no pet.) (“Wilson’s
economic argument does not create a factual dispute as to her compliance:  it
is, instead, in the nature of an excuse for her failure to comply.”).  Rather,
any excuse for failing to complete a family services plan goes only to the best
interest determination.  See T.N.F., 205 S.W.3d at 631; see also
Holley v. Adams, 544 S.W.2d 367, 371 (Tex.1976); In re C.M.C., 273
S.W.3d 862, 874–75 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (holding that
mother’s argument that she did not take a parenting class because none were
available “[did] not create a factual dispute as to her compliance; rather, it
is in the nature of an excuse for her failure to comply”).

The
evidence established that at the time of trial Father had not maintained
employment, had not registered with the Texas Workforce Commission since his
release from jail, did not consistently attend visitation with his children, and
had not attended counseling sessions pursuant to the court order.  We conclude
that a reasonable factfinder could have formed a firm belief or conviction that
Father failed to comply with the provisions of a court order that specifically
established the actions necessary for him to obtain the return of his children.
 We overrule Father’s second point.  Because, along with a best interest
finding, a finding of only one ground alleged under section 161.001(1) is
necessary to support a judgment of termination, we need not address Father’s
first point.  See Tex. R. App. P. 47.1; see also In re E.M.N.,
221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.); In re S.B.,
207 S.W.3d 877, 886 (Tex. App.—Fort Worth 2006, no pet.).

          B.
 Best Interest

          In
his fifth point, Father challenges the legal and factual sufficiency of the
evidence that termination is in the best interest of the children.

There
is a strong presumption that keeping a child with a parent is in the child’s
best interest.  In re R.R., 209 S.W.3d 112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child’s best interest.  Tex. Fam. Code Ann. § 263.307(a) (West
2008).  The following factors should be considered in evaluating the parent’s
willingness and ability to provide the child with a safe environment:

(1)     the child’s
age and physical and mental vulnerabilities;

 

(2)     the frequency
and nature of out-of-home placements;

 

(3)     the
magnitude, frequency, and circumstances of the harm to the child;

 

(4)     whether the
child has been the victim of repeated harm after the initial report and
intervention by the department or other agency;

 

(5)     whether the
child is fearful of living in or returning to the child’s home;

 

(6)     the results of
psychiatric, psychological, or developmental evaluations of the child, the
child’s parents, other family members, or others who have access to the child’s
home;

 

(7)     whether there
is a history of abusive or assaultive conduct by the child’s family or others
who have access to the child’s home;

 

(8)     whether there
is a history of substance abuse by the child’s family or others who have access
to the child’s home;

 

(9)     whether the
perpetrator of the harm to the child is identified;

 

(10)    the
willingness and ability of the child’s family to seek out, accept, and complete
counseling services and to cooperate with and facilitate an appropriate agency’s
close supervision;

 

(11)    the
willingness and ability of the child’s family to effect positive environmental
and personal changes within a reasonable period of time;

 

(12)    whether the
child’s family demonstrates adequate parenting skills, including providing the
child and other children under the family’s care with:

 

(A)   minimally
adequate health and nutritional care;

 

(B)   care,
nurturance, and appropriate discipline consistent with the child’s physical and
psychological development;

 

(C)  guidance and
supervision consistent with the child’s safety;

 

(D)  a safe physical
home environment;

 

(E)   protection from
repeated exposure to violence even though the violence may not be directed at
the child; and

 

(F)   an
understanding of the child’s needs and capabilities; and

 

(13)    whether an
adequate social support system consisting of an extended family and friends is
available to the child.

 

Id. § 263.307(b);
R.R., 209 S.W.3d at 116.

          Other,
nonexclusive factors that the trier of fact in a termination case may use in
determining the best interest of the child include:

(A)     the desires
of the child;

 

(B)     the emotional
and physical needs of the child now and in the future;

 

(C)     the emotional
and physical danger to the child now and in the future;

 

(D)     the parental
abilities of the individuals seeking custody;

 

(E)     the programs
available to assist these individuals to promote the best interest of the
child;

 

(F)     the plans for
the child by these individuals or by the agency seeking custody;

 

(G)     the stability
of the home or proposed placement;

 

(H)     the acts or
omissions of the parent which may indicate that the existing parent-child relationship
is not a proper one; and

 

(I)      any excuse
for the acts or omissions of the parent.

 

Holley,
544 S.W.2d at 371–72.

          These
factors are not exhaustive; some listed factors may be inapplicable to some
cases; other factors not on the list may also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed evidence of just one factor may be
sufficient in a particular case to support a finding that termination is in the
best interest of the child.  Id.  On the other hand, the presence of
scant evidence relevant to each factor will not support such a finding.  Id.

The
Department investigator Jackson testified that all of the children who were of
school age were behind in their education.  She testified that neither Mother
nor Father was maintaining contact with the children’s school.  The children
were supposed to be receiving free lunches, but the paperwork had never been
completed.  The school reported that S.G. was doing well, but Father testified
that he supervised the older children’s homework and they were both two grade
levels behind.

          Father
has been involved in four Department investigations since 2004.  The CPS
referral in 2008 was for the children wearing dirty clothes to school.  When
CPS investigated the house, there was no electricity and the house smelled. 
Father testified that it took two weeks to get the electricity back on.

Father
has a long criminal history dating back to 1996, including convictions for possession
of marijuana; possession of cocaine; possession of Xanax; and delivery of
cocaine, for which he served thirteen months in the penitentiary.  Father also served
two hundred days in jail for assaulting Mother.  Mother had registered with the
Victim Information and Notification Everyday (VINE) network to be notified when
he was released.  Father admitted that his criminal behavior was harmful to his
children.  But when he was asked whether anyone got hurt the night he assaulted
Mother, Father said, “If you read the police report, there’s no marks or no
scratches or nothing on her . . . so I would say no one got hurt.”  In fact,
Father claimed he was not guilty of the domestic violence charge but pleaded
guilty because his court-appointed attorney was not helping him and in light of
his previous felonies, one more misdemeanor “doesn’t do anything for [him].”

When
Mother described the assault at trial, she claimed that Father “lost his temper
and he punched some holes around my head and kind of grabbed me by my throat.” 
Father also destroyed Mother’s cell phone that night because he found messages
on it from another man.  Mother walked to the police station and reported
Father.  S.G. witnessed the assault and confirmed Mother’s story to the
police.  CPS investigator Jackson testified that it is harmful for children to
witness domestic violence in their home and that children often mimic the
behavior they learn from their parents.  Father’s mother (Grandmother) does not
believe that Father hurt Mother in the assault.  She also testified that there had
been one other incident of family violence before.

Father
was referred to Leticia Moreland for counseling.  Father did not attempt to
contact her for the first few months after his release from jail.  Moreland
suffered an aneurysm in December 2010, and thereafter was unavailable.  The
Department caseworker Nikithia Thomas testified that if Father called Brief
Therapy, they would have given him the name of another therapist in his area,
but Father never attended any counseling.  Father contacted the Child and
Family Guidance Center about parenting classes but gave them his mother’s phone
number instead of his own.  When they tried to return his call, they got no
response.  Thomas testified that in January of 2010, Father told her he had
gotten a car and would be able to start doing his services.  Yet Father did not
complete his parenting class until nine days before trial in March 2011.  Thomas
testified that she gave Father her cell phone number in case he had any
problems or questions, and he never called her to help with his services.

Jackson
testified that she had concerns that Father knew about Mother’s prostitution
but did nothing to protect the children.  Jackson testified that although
Father was in jail, he could have called the 1-800 number for CPS and made a
referral to protect his children.  Father argues on appeal that he did not know
that Mother was prostituting out of the children’s home because he was in jail,
but his testimony at trial was that as early as April 2009 he thought “she was
doing more than just massage therapy” because she “started making a lot of
money.”  Father also acknowledged that family members visited him while in jail
and he did not ask them to report or investigate his concerns.

Thomas
testified that she believed Father “was more concerned [with] what [Mother] was
going to do and how she was going to act versus what he needed to do to get his
kids back.”  He would ask when Mother was visiting the children so that he
could schedule his visits on the same day.  Thomas also testified that “lately,
he just hadn’t been visiting at all.”

Thomas
testified that once when Father visited and had brought food for his two
children, the other two children were present and “he actually was pretty good
about having kids share the food.”  She testified that Father “would sit in a
chair and tell the kids to bring him books or toys.  When it was time to clean
up, [Father] would sit in a chair and tell the kids to clean up.  That was
pretty much the extent of his interaction with the kids.”  She claimed that “he
really didn’t move, he didn’t get on the floor and interact with the kids and
play with the kids.  It was more of, you know, I’m here, they’re here, they see
me, I see them.  Okay, is my hour up yet?  It’s time to go.”  Thomas testified
that she would offer him extra time with his children to make up for missed
visits but he would tell her he had to leave.  She described one visit when she
offered him extra time and his mother, who had driven Father to the visit,
encouraged him to stay but he still insisted on leaving.  Although the children
enjoyed their visits with Father, this evidence is marginally relevant at best
because of their young age.  See In re S.N., 272 S.W.3d 45, 51–52
(Tex. App.—Waco 2008, no pet.) (“[I]t is doubtful that such evidence is indicative
of the [child]’s conscious, volitional desire to maintain a parent-child
relationship or to permanently sever that relationship.”).

The
CASA caseworker supervisor Kristen James also testified that Father did not
always show up for his visitation.  She stated that Father did not hold the
kids and that Grandmother “did more interacting with the kids than he did.”  She
said that when the children would bring him books, “[h]e wouldn’t read through
the book, [he’d] look through the book with the child.  I wasn’t sure if he
could read or not.”  She also testified that she never heard Father say he
wanted the kids to be with him.

James
testified that she had concerns about Father because “he needed to address his
anger issues and domestic violence, and that wasn’t even touched on” in the
services he completed.  She also testified that Father never told her he wanted
the children in his care but that “it was always that they should be with their
mom and not with him.”  Thomas believed that Father, by not doing his services,
had failed to alleviate the risk of abuse or neglect to the children.  She did
not believe it was in the children’s best interest to be returned to their
parents.  See In re T.M.J., 315 S.W.3d 271, 278–79 (Tex. App.—Beaumont
2010, no pet.) (holding the evidence legally and factually sufficient to
support finding that termination was in the best interest of the children when,
among other things, mother failed to complete her service plan, and her
counselor believed that mother expressed little concern about the children,
lacked interest in them, and lacked motivation to help herself or the
children).

Mother
testified that Father took the children “to the park, Chuck E. Cheese, to his
mom’s house, pretty much anywhere the kids wanted to go.”  Father’s aunt
testified that Father always fed the children “nourishing foods.”  She
testified that he took the children to school and to play in the park and “took
care of them like a father should.”  Father testified that he took the kids to
play at the park and the pool and played video games with them.  He also
testified that he took the children to the doctor and the dentist and the
hospital when they were sick late at night.  Yet he could not recall the name
of the children’s pediatrician.  At the family group conference in August 2010,
Father expressed concerns that the children were not being taken care of in
their foster home and that he was not being updated on the status of his case
while incarcerated.  Father never made any child support payments because he
was not court ordered to do so and because he “figured y’all [the Department]
were taking care of them.”  Grandmother testified that she wanted S.G. and
S.J.G. to live with her and Father.  Neither Grandmother nor Father’s aunt felt
they could care for the children on their own if Father’s parental rights were
terminated.

As
noted above, Father’s excuses are also considered in a best interest
determination.  See T.N.F., 205 S.W.3d at 631; see also Holley,
544 S.W.2d at 371; C.M.C., 273 S.W.3d at 874–75.  Father argues that his
“recent turnaround” is evidence that it is in the children’s best interest to
stay with him.  He points to his completion of the parenting class and that he
was looking for work.  However, Father testified at trial that he was waiting
until trial was over to start a job.  Father completed his parenting class only
nine days before trial, despite being out of jail for five months.  Despite
having no job and admittedly not looking for one during the trial, Father still
did not show up to trial until the second day because he “was never sent
anything that [he] was supposed to be [there].”  This is not evidence of a
“turnaround.”  See In re C.C., No. 13-07-00541-CV, 2009 WL 866822, at
*11 (Tex. App.—Corpus Christi Apr. 2, 2009, no pet.) (mem. op.) (holding that
mother had not made a turnaround when “the undisputed evidence showed that she
had failed to alleviate the main concern underlying the children’s removal”).

Considering
the relevant statutory factors in evaluating Father’s willingness and ability
to seek out, accept, and complete counseling services and to cooperate with and
facilitate an appropriate agency’s close supervision, his willingness to effect
positive environmental and personal changes within a reasonable period of time,
and the other relevant Holley factors, we hold that, in light of the
entire record, and giving due consideration to evidence that the trial court
could have reasonably found to be clear and convincing, the trial court could
reasonably have formed a firm belief or conviction that termination
of Father’s parental rights to the children is in the children’s best
interests.  Accordingly, the evidence is legally and
factually sufficient to support the trial court’s family code section
161.001(2) best interest finding.  We
overrule Father’s fifth point.

II.  Due
Process and Family Reunification Services

In
Father’s third point, he argues that his right to due process was violated by
the State’s failure to timely communicate the results of his drug and alcohol
assessment and his psychological evaluation.  He argues that without the
results, he was unaware of the specific actions he was required to take to
obtain the return of his children.[4]  In his fourth point,
Father argues that the Department failed to provide sufficient family
reunification services as required by the family code.  Section 263.102(e) of
the family code states,

Regardless of whether
the goal stated in a child’s service plan as required under Subsection (a)(5)
is to return the child to the child’s parents or to terminate parental rights
and place the child for adoption, the department shall concurrently provide to
the child and the child’s family, as applicable:

 

(1)   time-limited
family reunification services as defined by 42 U.S.C. Section 629a for a period
not to exceed the period within which the court must render a final order in or
dismiss the suit affecting the parent-child relationship with respect to the
child as provided by Subchapter E . . . .

 

Tex.
Fam. Code Ann. § 263.102(e) (West 2008).

Father
argues that because he did not receive the results of his drug and alcohol
assessment and his psychological evaluation (including any further steps he was
required to complete based on the results of the evaluations), the Department
failed to provide sufficient family reunification services as required by the
statute.

Even
if Father should have received the results of his drug and alcohol assessment
and his psychological evaluation, he has suffered no harm because he failed to
complete a number of other specific actions listed in his service plan,
including maintaining employment, registering with the Texas Workforce
Commission, visiting with his children as ordered, and attending counseling
sessions.  See Tex. R. App. P. 44.1(a)(1) (requiring that an error
complained of cannot be reversed on appeal unless it is shown to have probably
caused the rendition of an improper judgment).  That is, even if he had
received the results of his assessments and completed any recommendations, he
still would have failed to meet the other requirements for the return of his
children.  We overrule Father’s third and fourth points.

Conclusion

          Having
overruled all of Father’s points on appeal, we affirm the judgment of the trial
court.

 

 

 

LEE GABRIEL
JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; MEIER and GABRIEL, JJ.

 

DELIVERED:  November 10,
2011








 









[1]See Tex. R. App. P. 47.4.





[2]The April 2010
investigation was the fifth investigation of Mother and the fourth of Father. 
The Department was first notified of Mother and her two older children in 2002,
before Father’s two children were born.  The Department was notified again in
2004, regarding a mark on one of the children’s backs and on one of their
lips.  That investigation was ruled unable to determine.  The third
investigation was also in 2004 regarding improper feeding.  In July 2008, the
Department was notified again because “there was no food in the home, the
family was borrowing electricity from a neighbor, [and] it was cluttered, it
smelled, [and there were] dirty clothes all over the home.”  The investigation
was ruled reason to believe.





[3]The trial court also
terminated the parental rights of Mother and the biological father of Mother’s
two oldest children.  Neither Mother nor the other father are a party to this
appeal.





[4]Father relies on In re
B.L.R.P., 269 S.W.3d 707 (Tex. App.—Amarillo 2008, no pet.).  That case
held that because there was no court order specifically establishing the
necessary actions the parent needed to take to obtain the return of his child,
Father’s parental rights could not be terminated under subsection (O).  Id.
at 711.  In this case, there was a court order.  B.L.R.P. is thus
inapposite here.